# UNITED STATES COURT OF APPEALS
## FIFTH CIRCUIT

_____

No. 01-50107

_____

In The Matter Of: EL PASO REFINERY, LP

                       Debtor

REFINERY HOLDING CO, LP

                       Appellee,

versus

TRMI HOLDINGS, INC; TEXACO, INC; ANDREW B KRAFSUR,
Trustee,

                       Appellants

----------------------------------------

In The Matter Of: EL PASO REFINERY, LP

                       Debtor

TRMI HOLDINGS, INC; TEXACO, INC

                       Appellants,

versus

REFINERY HOLDING CO, LP

                       Appellee

----------------------------------------

In The Matter Of: EL PASO REFINERY, LP

                       Debtor

ANDREW B KRAFSUR, Trustee

                       Appellant,

versus

REFINERY HOLDING CO, LP

                       Appellee.

---

Appeals from the United States District Court
For the Western District of Texas

August 22, 2002

Before EMILIO M. GARZA, BENAVIDES, and STEWART, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

     This appeal arises out of an attempt to allocate the contractual liability for environmental

contamination among the past and present owners of an oil refinery in El Paso, Texas (the "Refinery"). The Appellee, Refinery Holding Company, L.P. ("RHC") is the current owner of the Refinery. The Appellants are former owners of the Refinery and include Andrew B. Krafsur, in his capacity as Chapter 7 Trustee (the "Trustee") for the bankruptcy estate of El Paso Refinery, L.P. (the "Estate"), Texaco Inc. ("Texaco"), and TRMI Holdings Inc. ("TRMI"). RHC originally sought declaratory relief in bankruptcy court, seeking a judgment defining the responsibilities of the parties in relation to the environmental contamination at the Refinery. After the bankruptcy court issued its final judgment, the parties separately appealed to the district court. The district court consolidated the appeals, and affirmed in part and reversed in part the bankruptcy court's judgment. The Trustee, Texaco, and TRMI then filed a joint appeal to this court.

I

We begin with a summary of the long and complicated factual and procedural history of this case. Texaco built the Refinery in 1929 in El Paso, Texas and operated it until 1984, when it spun off most of its refineries, including the El Paso Refinery, to a wholly-owned subsidiary. The subsidiary taking ownership was named Texaco Refining and Marketing, Inc., but later changed its name to TRMI Holdings, Inc. ("TRMI"). As part of the spin-off transaction, TRMI agreed to assume all responsibility for environmental contamination at the Refinery. Shortly thereafter, in 1986, TRMI sold the Refinery to El Paso Refinery, L.P. (the "Debtor"). The Debtor took ownership of the Refinery through a series of conveyances between corporate entities associated with the Debtor. First, TRMI signed a Purchase Agreement (the "Purchase Agreement") with El Paso Refinery, Inc. ("Old Inc."), and then conveyed the Refinery by special warranty deed (the "TRMI Deed") to El Paso Refining Co., Ltd. ("El Paso Ltd."). El Paso Ltd. then conveyed the Refinery to Old Inc., who in turn

-2-

conveyed the Refinery to El Paso Refining, Inc., ("New Inc."), who finally transferred the Refinery to the Debtor. The documents accompanying this transfer are vitally important in this appeal, because both the Purchase Agreement and the TRMI Deed include warranties, representations, and indemnification provisions regarding environmental contamination at the Refinery. In particular, both documents include covenants preventing any subsequent owner from seeking contribution from TRMI, or from compelling TRMI to take any remedial action.

Six years later, in 1992, the Debtor filed for Chapter 11, and operations at the Refinery ceased. Once in bankruptcy, the bankruptcy court's restrictions forced the Debtor to place the Refinery in "warm shut-down mode," which kept it operating without producing any oil. This resulted in operating costs without the prospect of any revenue. Faced with mounting losses, the Debtor's major creditor, a group called the Term Lenders, swiftly moved to lift the bankruptcy stay and foreclose upon the Refinery so that it could resume operations.[1] To that end, in March 1993 the Term Lenders and the bankruptcy examiner executed a two-page agreement, the terms of which allowed the Term Lenders to foreclose upon and sell the Refinery, in exchange for the payment of money into the bankruptcy estate and the assumption of certain responsibilities by the buyer. This spartan agreement, referred to as the "Term Sheet," included provisions governing the allocation of environmental liability between the buyer and the Estate, and is the most important document in this appeal. With regard to the environmental conditions, paragraph two of the Term Sheet provides:

> Upon foreclosure of the refinery assets, the entity acquiring the refinery assets (the "Acquiring Entity") shall be responsible for all

---

[1]The Term Lenders' involvement with the Refinery dates back to the Debtor's original purchase of the Refinery, which was financed in part by the C.I.T. Corporation ("CIT"). CIT, as part of the group of Term Lenders, later loaned the Debtor $115 million prior to its bankruptcy filing. When the Debtor filed for Chapter 11 bankruptcy in 1992, it owed the Term Lenders $131 million.

environmental risks associated with the refinery assets from and after the date of foreclosure.  The Acquiring Entity shall take the refinery assets subject to all written existing remedial orders.  The Acquiring Entity shall not assert any claims for contribution and/or indemnity against the estate for environmental liability.

When the Term Lenders foreclosed on the Refinery in 1993, they also made a successful bid to acquire the Refinery, which they conveyed to a holding company created for this purpose, Refinery Holding Company, L.P. ("RHC").  RHC then gave written notice that it intended to assert contribution and environmental claims against TRMI and Texaco.  In defense, TRMI tendered a claim to the Trustee, citing provisions in the Purchase Agreement entitling TRMI to indemnification by the Debtor.  Eventually, TRMI and the Trustee entered into a settlement agreement (the "Settlement Agreement"), approved by the bankruptcy court over RHC's objection, which granted TRMI an allowed claim against the Estate for any amount for which TRMI might be found liable to RHC.[2]  The allocation of environmental responsibility remained an unresolved issue following the execution of the Settlement Agreement.  The Debtor and RHC took opposing views of the provisions in the Term Sheet regarding environmental liability.  RHC contended that it assumed liability only for contamination resulting from post-foreclosure operations at the Refinery in the Term Sheet, while the Debtor argued that RHC assumed all responsibility for environmental conditions and further agreed to impliedly indemnify the Estate for any future remediation costs.  In addition, TRMI and Texaco asserted that provisions in the Purchase Agreement and the TRMI Deed created binding obligations on RHC with respect to the environmental liability, and absolved TRMI from any responsibility for the environmental conditions at the Refinery.

_____

[2]The Settlement Agreement included a cap of $1.5 million on any distribution to TRMI as a result of its allowed claim.  This cap was later increased to $2 million by the parties' agreement.

RHC originally brought this action for declaratory relief in the bankruptcy court to clarify how the Term Sheet, the Purchase Agreement, and the TRMI Deed allocated environmental responsibility among the parties. The Bankruptcy Court held that under the Term Sheet, RHC assumed full responsibility for undiscovered environmental contamination at the Refinery, agreed to be bound by the TWC Order,[3] and impliedly indemnified the Estate against all environmental liability by operation of the "circuity of action" doctrine. The bankruptcy court further held that neither TRMI nor Texaco were third-party beneficiaries of the Term Sheet, and that covenants in the Purchase Agreement and the TRMI Deed did not create binding obligations on RHC with respect to the environmental contamination. *In re El Paso Refinery, L.P.*, No. 94-30051-LMC (Bankr. W.D. Tex. Oct. 14, 1999). The parties separately appealed to the district court. The district court reversed the bankruptcy court's determination with regard to RHC's obligations under the Term Sheet, holding that the Term Sheet did not bar RHC from seeking contribution from TRMI or Texaco, but affirmed the bankruptcy court's holding concerning third-party beneficiary status and the covenants in the TRMI Deed. *In re El Paso Refinery*, *L.P.*, No. EP-99-CA-395-H (W.D. Tex. Nov. 30, 2000). The Trustee, Texaco, and TRMI (collectively, the "Appellants") now appeal.

We must now review the conclusions of the bankruptcy and district courts with regard to five issues: (1) whether the bankruptcy and district courts had jurisdiction over Texaco; (2) whether the Term Sheet contains an implied indemnity by RHC in favor of the Estate such that RHC is barred from seeking contribution from TRMI or Texaco by virtue of the "circuity of action" doctrine; (3)

---

[3]On July 1, 1987, the Texas Water Commission (now known as the Texas Natural Resource Conservation Commission, or TNRCC), issued an order requiring El Paso Ltd. to take certain remedial measures with regard to environmental contamination at the Refinery (the "TWC Order"). The order identifies the known environmental conditions at the Refinery, and has subsequently been amended but remains in effect.

whether the Term Sheet allocates all responsibility for unknown environmental contamination to RHC; (4) whether TRMI is a third-party beneficiary of the Term Sheet; and (5) whether the covenants in the TRMI Deed and Purchase Agreement are binding on RHC as a subsequent purchaser.

In this bankruptcy appeal, we review any legal conclusions de novo and findings of fact for clear error, guided by the same standards as the bankruptcy and the district courts. *In re Miller*, 290 F.3d 263, 266 n.2 (5th Cir. 2002).

II

As an initial matter, we must consider whether the bankruptcy court properly exercised jurisdiction over Texaco. Specifically, Texaco contends that the bankruptcy court lacked subject matter jurisdiction over RHC's claims against it, because these claims do not relate to the bankruptcy proceeding. The bankruptcy court has jurisdiction over all claims "related to" a bankruptcy proceeding. *See* 28 U.S.C. § 1334(b) ("[T]he district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."). A matter is "related to" a bankruptcy case if "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Feld v. Zale Corp.* (*In re Zale Corp.*), 62 F.3d 746, 752 (5th Cir. 1995) (quoting *Pacor, Inc., v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)).

Texaco argues that, because it is not a creditor of the Debtor, nor has it asserted a claim with the Trustee, it is an unrelated third party in this proceeding and jurisdiction is inappropriate. The district court properly rejected this argument.

We believe RHC's claims against Texaco are related to the bankruptcy estate because of

Texaco's status as former owner of the Refinery. RHC filed this declaratory action in an attempt to define the rights and responsibilities of all of the parties with respect to environmental contamination at the Refinery. Because Texaco formerly owned the contaminated property which is at the center of this dispute, it is necessarily implicated in this action. *See Feld*, 62 F.3d at 753 (upholding "related to jurisdiction" over third parties when subject of third-party dispute is property of the estate). Moreover, contrary to Texaco's assertions, RHC's claim against Texaco could conceivably have an effect on the Estate in light of the chain of indemnification provisions beginning with Texaco and leading directly to the Debtor. When RHC gave notice of its intention to seek contribution, Texaco easily could have asserted an indemnification claim against TRMI, who in turn could have amended its claim with the Trustee by virtue of the Debtor's obligation to indemnify TRMI. In sum, because Texaco is related to the bankruptcy proceeding, we conclude that the bankruptcy court properly exercised jurisdiction over Texaco.[4]

---

[4]Texaco makes several additional arguments relating to whether the bankruptcy court should have dismissed RHC's claims against Texaco. First, Texaco argues that the bankruptcy court should have dismissed its claims based on the lack of a justiciable controversy. However, in light of the fact that RHC has already notified Texaco that it intends to pursue contribution, as well as the fact that RHC has already incurred remediation expenses at the Refinery, we find this argument to be completely meritless. *See Associated Indem. Corp. v. Fairchild Indus., Inc.*, 961 F.2d 32, 35 (2d Cir. 1992) (holding contingent liability is proper subject of declaratory action if contingency is likely to occur). Second, Texaco argues that the bankruptcy court abused its discretion in not dismissing RHC's declaratory action, because t his case will not resolve the entire controversy between the parties. Because we believe that clarification of the rights of the parties with regard to the Term Sheet is a distinct and separate issue justifying a declaratory action, we also reject this argument. *See* CHARLES WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FED. PRAC. & PROC. § 2759 (3d ed. 1998) (explaining that in deciding whether to hear a case, courts focus on certain factors, including: (1) whether the judgment would serve a useful purpose in clarifying the legal relations at issue; and (2) whether the action would afford relief from uncertainty). Finally, Texaco argues that the existence of another lawsuit involving the same issues weighs against the appropriateness of declaratory relief. *See Mission Ins. Co. v. Puritan Fashions Corp.*, 706 F.2d 599, 603 (5th Cir. 1983) ("The existence of an adequate alternative remedy is a factor properly considered in the exercise of the district court's discretion."). Although the parties acknowledge a pending toxic tort

III

We must next consider whether RHC's contribution claim against TRMI and Texaco is barred by the circuity of action doctrine. Specifically, TRMI argues that the third sentence of the Term Sheet, in which RHC agrees not to sue the Estate for contribution or indemnification, obligates RHC to impliedly indemnify the Estate, such that any claim by RHC is prevented by the Estate's corresponding obligation to indemnify TRMI.

Texas courts apply the circuity of action doctrine to extinguish a plaintiff's cause of action when, as the result of indemnification obligations or settlement agreements between the parties, a plaintiff would end up indemnifying another party for its own original claim. *Phillips Pipe Line Co. v. McKown*, 580 S.W.2d 435, 440 (Tex. Civ. App.–Tyler 1979, writ ref'd n.r.e.).[5] In order to invoke circuity of action as a defense in this case, TRMI must show that two requirements are met. First, the non-settling defendant [TRMI] must be entitled to indemnity or contribution from the settling

---

action in Texas state court against RHC, we find this argument unpersuasive. This declaratory action seeks only to interpret the contractual provisions governing the allocation of liability among the parties. Thus, a state tort suit addressing causation and culpability will not resolve the same issues. *See Harris v. U.S. Fid. & Guar. Co.*, 569 F.2d 850, 852 (5th Cir. 1978) ("The controversy settled by the declaratory judgment need only be an autonomous dispute.").

[5]The concept of circuity of action has its origin in the Texas Supreme Court's decision in *Palestine Contractors, Inc. v. Perkins*, 386 S.W.2d 764 (Tex. 1964). In *Palestine*, the plaintiff reached a settlement agreement with one of two joint tortfeasors after the plaintiff was injured in an automobile accident. The court reasoned that if the plaintiff was subsequently permitted to seek full recovery from the non-settling tortfeasor, then the non-settling defendant would have a right of contribution against the settling defendant, who would in turn would have a viable claim against the plaintiff based on the language of the settlement agreement. Thus, the court held that the plaintiff's recovery against the non-settling defendant was limited by the amount received from the settling defendant. The holding in *Palestine* has been superseded by Texas's adoption of the comparative fault doctrine. *See Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 430 (Tex. 1984) ("Accordingly, we hold that a settlement with one tortfeasor will reduce the liability of the nonsettling defendants by the percentage of causation allocated to the settling tortfeasor rather than by a pro rata share.").

defendant [the Debtor]. *Knutson v. Morton Foods, Inc.*, 603 S.W.2d 805, 812 (Tex. 1980) (Garwood, J., concurring). Second, "there must be an express or implied obligation on the part of the plaintiff [RHC] to hold harmless the settling tort-feasor [the Debtor] from further liability, by indemnity or contribution." *Id.* Both parties concede that TRMI is entitled to indemnification from the Estate under the terms of the Settlement Agreement, thus fulfilling the first requirement.[6] Therefore, we are faced only with the question of whether RHC agreed to indemnify the Estate, either expressly or impliedly, in the Term Sheet.

The last sentence of the relevant section of the Term Sheet provides: "The acquiring entity [RHC] shall not assert any claims for contribution and/or indemnity against the estate for environmental liability." The bankruptcy court held that this covenant not to sue created an implied indemnity by RHC sufficient to trigger application of the circuity doctrine. The district court, in contrast, concluded that this provision was insufficient to invoke the circuity of action doctrine, as it expressed no clear intent by RHC to indemnify the Estate against all claims.[7] We agree with the district court's conclusion, and hold that RHC's claim is not barred by circuity of action.

---

[6]The Settlement Agreement gives TRMI a "general unsecured claim" against the Estate "for any amounts that [Old Inc.] may be finally determined to be liable to RHC relating to remediation at the EPR Refinery." However, under t he Settlement Agreement's terms, TRMI is only entitled to "share on a pro rata basis with other general unsecured credit ors in any distributions from the LP estate," and the total amount of any distribution to TRMI on account of its claim is capped at $2 million. Thus, although TRMI can submit the full amount of its claim to the Trustee, its total recovery is limited. Texaco, in turn, is entitled to indemnification from TRMI.

[7]We note that the district court based its conclusion, in part, on Texas' express negligence rule. *See Ethyl Corp. v. Daniel Constr. Co.*, 725 S.W.2d 705, 708 (Tex. 1987) ("The express negligence doctrine provides that parties seeking to indemnify the indemnitee from the consequences of its own negligence must express that intent in specific terms."). Because we base our conclusion on alternate grounds, namely the relevant caselaw interpreting the circuity of action doctrine, we do not address the express negligence rule in this opinion.

First, the Term Sheet's language does not include a clear enough expression of RHC's intent to indemnify. Circuity of action is normally triggered by an affirmative and unequivocal agreement to indemnify and hold the settling defendant harmless from any and all related claims. For example, in *Moore v. Southwestern Electric Power*, the relevant indemnification provision obligated the plaintiff to "indemnify and hold harmless [the settling defendants] from any further claim, demand, or cause of action whatsoever, whether herein mentioned or not, growing out of or in any way resulting or to result from the aforementioned occurrence forming the basis of this claim." 737 F.2d 496, 501 (5th Cir. 1984); *see also Phillips Pipe Line*, 580 S.W.2d at 439 ("It is the express intention of the parties hereto to release any and all claims which [the plaintiffs] have against [the settling defendant]. . .as well as to protect such parties from any and all claims which [the non-settling defendant] might have against [the settling defendant]. . .as the result of claims made against [the non-settling defendant] by [the plaintiffs]"); *Panhandle Gravel Co. v. Wilson*, 248 S.W.2d 779, 783-84 (Tex. Civ. App.– Amarillo 1952, writ ref'd n.r.e.) ("[The plaintiff] does hereby bind himself, his heirs, executors and administrators to save and keep harmless and fully indemnify the said [settling defendants] against all and every claim, demand or cause of action growing out of said accident referred to in said suit or that has been asserted in said suit or that might or could be in said suit asserted."). In this case, the Term Sheet does not unequivocally indicate an agreement to indemnify and hold the settling defendant harmless. Instead, the Term Sheet includes only a covenant not to sue the Estate. It makes no mention of related claims, nor any claim potentially arising out of or related to the agreement between the parties.[8]

---

[8]We note that in other circuity of action cases, the settling defendant also agreed to waive any future claims against the plaintiff. *See Starcraft Co. v. C.J. Heck Co. of Tex., Inc.*, 748 F.2d 982, 985 n.1 (5th Cir. 1984) ("[The settling defendants] release and waive all claims they may have or could

Further, the fact that TRMI and the Estate entered into the Settlement Agreement creating this circle of indemnifications *after* the Term Sheet was executed indicates to us that it was not the intent of RHC to impliedly indemnify *TRMI* at the time it signed the Term Sheet.[9] In no other circuity of action case did the indemnification obligation between the settling and non-settling defendants arise by virtue of a contract voluntarily executed after the plaintiff reached an agreement with the settling defendant. *See Starcraft*, 748 F.2d at 986 (non-settling defendant entitled to charge back against settling defendant by judicial order); *Moore*, 737 F.2d at 500 (non-settling defendant entitled to indemnification from settling defendant under statute); *Phillips Pipe Line*, 580 S.W.2d at 439 (under existing contract, settling defendant obligated to indemnify non-settling defendant); *Panhandle Gravel*, 248 S.W.2d at 782-83 (settling defendant obligated to indemnify non-settling defendant under terms of existing insurance contract). Here, it appears that the Estate and TRMI executed the Settlement Agreement for the express purpose of creating a circular pattern of indemnification that could bar RHC's claims for contribution. Thus, we hold that the language of the Term Sheet does not create an implied indemnity by RHC in favor of TRMI, and the circuity of action doctrine does not bar RHC's claims.

IV

---

assert against [the plaintiff]. Accordingly, in consideration of the mutual covenants set forth herein, the parties hereby mutually release, discharge and acquit one another of any and all claims, demands and causes of action, whether or not asserted in the above-referenced litigation, and whether known or unknown."). Here, the Estate does not waive any claims against RHC, a fact which indicates that this is purely a covenant not to sue, rather than an indemnity provision.

[9]Although it appears that the Debtor was obligated to indemnify TRMI through provisions in the Purchase Agreement dating from the 1986 sale of the Refinery, it was not until the parties executed the Settlement Agreement that TRMI was guaranteed a claim against the bankruptcy estate to cover the costs of any contribution claim by RHC.

We must also determine whether RHC, under the Term Sheet, assumed responsibility for all unknown environmental conditions at the Refinery. The Term Sheet provides:

> Upon foreclosure of the refinery assets, the entity acquiring the refinery assets (the "Acquiring Entity" [RHC]) shall be responsible for all environmental risks associated with the refinery assets from and after the date of foreclosure.

The bankruptcy court and the district court adopted radically different interpretations of this provision. The bankruptcy court held that in this sentence, RHC assumed total responsibility for all environmental problems unknown to the parties at the time of the agreement. The district court, on the other hand, concluded that RHC intended only to accept responsibility for all environmental risks resulting from its operations "from and after the date of foreclosure."

When construing a contract, our primary goal is to "give effect to the written expression of the parties' intent." *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994) (en banc). When interpreting a contract, we must consider the contract "as a whole," to ensure that "each part of the contract [is] given effect." *Id.* Here, the parties have offered differing interpretations of the clause "from and after the date of foreclosure," and its impact on the meaning of the Term Sheet. RHC argues that this phrase modifies the words "shall be responsible," and operates to limit RHC's exposure under the contract to liabilities arising after foreclosure. The Appellants, on the other hand, contend that "from and after the date of foreclosure" modifies the phrase "all environmental risks," and shows that RHC knowingly assumed liability for both pre- and post-foreclosure liabilities.[10]

_____

[10]This conflict in interpretation alone is not enough to show that the Term Sheet is ambiguous. *See Forbau*, 876 S.W.2d at 134 (stating that differences in interpretation are not enough to create an ambiguity). After applying the relevant rules of contract construction to the agreement, we do not believe that it is subject to more than one reasonable interpretation. *Trinity Indus., Inc. v. Ashland, Inc.*, 53 S.W.3d 852, 860 (Tex. App.–Austin 2001, pet. denied) ("If the contract is subject to two or more reasonable interpretations after applying the relevant rules of contract construction, the

-12-

Based on the language of the contract, we find RHC's interpretation to be more persuasive.[11]

If RHC intended to assume responsibility for all unknown environmental risks, as the Appellants contend, the parties could have eliminated the "from and after" language from the provision because such a qualifier would be unnecessary. The parties could likewise have eliminated the next sentence discussing the TWC Order, which identifies the known environmental conditions at the Refinery, as it would be obvious that RHC would "take the refinery assets subject to all written existing remedial orders" if it were indeed assuming *all* environmental liability.[12] We reject the Appellants' argument that the insertion of the words "from and after" simply clarified the start date of RHC's obligations under the Term Sheet. Instead, we believe that the introductory phrase "upon foreclosure" identifies the relevant start date, rather than the "from and after" language.[13]

The circumstances surrounding the execution of the Term Sheet also support this interpretation. *See Trinity Indus.*, 53 S.W.3d at 860 (stating that courts should consider evidence of

contract is ambiguous, which creates a fact issue on the parties' intent.").

[11]The Appellants have raised an additional argument, which is that this interpretation impermissibly adds the term "operations" into the provision. We disagree. While courts are clearly prohibited from introducing new provisions into a contract, we believe that in this instance, the word "operations" is implicit and its inclusion merely clarifies the meaning of the sentence. *Cf. Southwest E&T Suppliers, Inc. v. American Enka Corp.*, 463 F.2d 1165, 1166 (5th Cir. 1972) (stating that courts cannot introduce new provisions to contract upon suggestion of the parties).

[12]Sentence two of this paragraph provides: "The Acquiring Entity [RHC] shall take the refinery assets subject to all written existing remedial orders."

[13]The Appellants also argue that we cannot read this sentence to allocate only post-foreclosure liability to RHC, because such an interpretation would create a redundancy with state law. This argument lacks merit, as contractual provisions confirming the parties' rights under state law are permissible, and should be given their intended effect. *See Dub Shaw Ford, Inc. v. Jackson*, 622 S.W.2d 664, 666 (Tex. App.-Fort Worth 1981, n.w.h.) (approving contractual provision that "simply restates the law").

surrounding circumstances when interpreting a contract). A proposed first draft of the Term Sheet, under which RHC assumed responsibility for all known and unknown environmental liabilities, was rejected and the present language was substituted in its place.[14] It seems unlikely that once this first draft was rejected, RHC would later have agreed to the same condition worded in more convoluted language. Thus, upon consideration of the Term Sheet's language, examined in light of surrounding circumstances, we interpret this provision to allocate only post-foreclosure environmental liability to RHC, consistent with the terms of the existing TWC Order. *See City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 519 (Tex. 1968) (considering contract's language, surrounding circumstances, and rules of construction to interpret contract's meaning).[15]

V

TRMI also asserts that it is a third-party beneficiary of the Term Sheet and is entitled to its benefits. In essence, TRMI argues that because it is a third-party beneficiary, RHC is barred from asserting environmental claims against it because TRMI can enforce the provisions of the Term Sheet against RHC. We first note that under our interpretation of the Term Sheet, RHC does not assume

---

[14]The proposed first draft stated: "The Term Lenders will indemnify estate for all environmental liabilities." Counsel for the Term Lenders states in her affidavit that "we definitively rejected this request and made clear our position that neither the Term Lenders nor any acquiring entity would be responsible for pre-foreclosure environmental liability. Instead, we offered that the Term Lenders would accept responsibility for environmental risks due to operations from and after the foreclosure date. The examiner agreed to this concept."

[15]Moreover, we note that extrinsic evidence of the parties' intent reinforces our conclusion. The bankruptcy examiner, who was involved in the negotiations between the parties, testified at the hearing seeking approval of the Term Sheet that it was his understanding that only "the current known EPA problems [would] be assumed by the term lenders," and that the Term Lenders were not indemnifying the Estate for any environmental claims that might be asserted against it. In fact, he agreed that it was "perfectly clear" that the Term Lenders were not indemnifying the Estate for any unknown environmental conditions in the Term Sheet.

responsibility for all unknown environmental conditions at the Refinery, a point which significantly undermines TRMI's credit-beneficiary argument. Regardless of this fact, however, TRMI does not meet the requirements for third-party-beneficiary status under Texas law. In order to qualify as a third-party beneficiary, a party must establish both that (1) the contracting parties intended to confer some benefit to the third party, and (2) the contracting parties entered into the contract directly for the third party's benefit. *MCI Telecommunications Corp. v. Texas Utils. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999). TRMI argues that it is a creditor beneficiary of the Term Sheet because the contract will result in the satisfaction of a legal duty owed to it. *Talman Home Fed. Sav. & Loan Assoc. of Illinois v. American Banker's Ins.*, 924 F.2d 1347, 1352 (5th Cir. 1991) (stating that a party is a creditor beneficiary when "performance of the promise would satisfy an actual or supposed or asserted duty of the promisee to the third party, and no intention to make a gift appears."). Specifically, TRMI contends that the Term Sheet's provisions shift the responsibility for environmental contamination to RHC, thus satisfying all of the Debtor's contractual obligations to TRMI.

Regardless of whether TRMI benefits in some manner from the Term Sheet, it is still not a third-party beneficiary because the intent to benefit is not clear from the language of the agreement. *See Republic Nat'l Bank v. Nat'l Bankers Life Ins. Co.*, 427 S.W.2d 76, 80 (Tex. Civ. App.–Dallas 1968, writ ref'd n.r.e.) ("Where a stranger contends that it was intended that the provisions of a contract should inure to his benefit such intention must be clearly apparent."). In determining intent under Texas law, a presumption applies that parties contract for themselves. *See Talman*, 924 F.2d at 1350-51; *Republic Nat'l Bank,* 427 S.W.2d at 79. In searching for the parties' intent, we are limited to the "four corners of the instrument." *Republic Nat'l Bank,* 427 S.W.2d at 79-80. The

Term Sheet allocates responsibility for environmental contamination between RHC and the Estate, and does not include a reference to TRMI, Texaco, or to any prior owner of the Refinery. Thus, we believe that any benefit conferred upon TRMI by way of reduction of responsibility for environmental cleanup is purely incidental. *See Missouri Pac. R.R. Co. v. Harbison-Fischer Mfg. Co.*, 26 F.3d 531, 540 (5th Cir. 1994) (holding former owner cannot assert rights as third-party beneficiary under lease allocating environmental responsibility between current owner and lessee when not identified in contract and no intent to benefit is evident). One who receives an incidental benefit from a contract is not a third-party beneficiary. *MCI Telecommunications*, 995 S.W.2d at 651; *Republic Nat'l Bank*, 427 S.W.2d at 80. In sum, because the Term Sheet was not entered into "directly and primarily" for TRMI's benefit, we hold that TRMI is not a third-party beneficiary of the agreement. *Republic Nat'l Bank*, 427 S.W.2d at 81.

VI

Finally, we must determine whether the covenants executed by the Debtor during its purchase of the Refinery from TRMI are binding on RHC. When TRMI sold the Refinery to the Debtor, it included covenants in the TRMI Deed preventing future owners from seeking contribution from TRMI or from compelling TRMI to take any remedial action at the Refinery.[16] In regard to

---

[16]The Purchase Agreement executed by the parties also contains environmental covenants. The agreement identifies and discloses specific environmental conditions which existed at the Refinery at the time of the TRMI-Old Inc. transfer, and obligates the buyer (Old Inc.) to assume responsibility for the clean-up of all disclosed conditions. In a separate provision, the buyer agrees to indemnify TRMI with respect to any environmental liability on the property. Finally, the Agreement includes a covenant not to sue TRMI, and a provision barring the buyer from compelling TRMI to take any remedial action. The Appellants argue that the environmental covenants included in the Purchase Agreement, as well as the covenants in the TRMI Deed, are binding upon RHC as a subsequent purchaser of the Refinery. First, we note that the major covenant at issue, the covenant not to sue TRMI, is incorporated in the TRMI Deed. Second, it is not clear that the contracting parties intended the other covenants in the Purchase Agreement to bind subsequent owners of the Refinery. In any

-16-

environmental liabilities, the TRMI Deed provides:

> Grantee [El Paso Ltd.] covenants and agrees that it shall never, directly or indirectly, attempt to compel Grantor [TRMI] to clean up, remove or take remedial action or any other response with respect to any of the buried sludge sites, the waste pile site, the Active Hazardous Waste Storage Sites, the underground liquid petroleum and petroleum vapors (including, without limitation, any leaching therefrom or contamination of the air, ground or the ground water thereunder or any effects related thereto), or any and all waste water treatment ponds or treatment systems on or in the vicinity of said premises or seek damages therefor. This covenant shall run with the land and shall bind Grantee's successors, assigns and all other subsequent owners of the property.

Appellants argue that this provision prevents RHC from seeking contribution or indemnity from TRMI for any environmental clean-up costs. The Appellants raise two arguments to support their position. First, they contend that the deed's language creates a real covenant that runs with the land. Alternatively, they argue that the restriction is enforceable as an equitable servitude.[17]

We must first determine whether the TRMI Deed contains a real covenant enforceable at law. Under Texas law, a covenant runs with the land and binds subsequent owners when it: (1) touches and concerns the land; (2) relates to a thing in existence, or specifically binds the parties and their

---

event, however, because the requirements for a covenant to bind a non-party to the original contract are the same with respect to both the agreement and the deed, we limit our discussion in this opinion to the TRMI Deed. Obviously, our conclusion with respect to the TRMI Deed will apply to the Appellants' arguments regarding the covenants in the Purchase Agreement, because these covenants also relate to whether RHC is barred from bringing a contribution action against TRMI.

[17]Under Texas law, an equitable servitude is also referred to as a personal covenant. *See* 16 TEX. JUR. 3d *Covenants, Conditions, and Restrictions* § 10 (2002) (distinguishing between real and personal covenants). Texas caselaw therefore utilizes the term "personal covenant" in two contexts)) first, as a purely personal covenant not enforceable at law or in equity; and second, as an equitable servitude. For maximum clarity, we will use the term "equitable servitude" to describe an enforceable restriction which is not a real covenant, and the term "personal covenant," to refer to a totally unenforceable restriction.

assigns; (3) is intended by the original parties to run with the land; and (4) when the successor to the burden has notice. *Inwood N. Homeowners' Ass'n v. Harris*, 736 S.W.2d 632, 635 (Tex. 1987); 16 TEX. JUR. 3D *Covenants, Conditions and Restrictions* § 10 (2002). The parties do not dispute that the TRMI Deed's language expressly attempts to bind the parties, that the contracting parties intended to bind successive purchasers, and that RHC had notice of the deed's provisions. Therefore, we must determine only whether the covenant "touches and concerns" the land.

The parties disagree as to the correct test to apply in order to determine if a covenant touches and concerns the land. In general, a covenant touches and concerns when it affects the "nature, quality or value of the thing demised, independently of collateral circumstances, or if it affect[s] the mode of enjoying it." *Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 911 (Tex. 1982); 3 HERBERT T. TIFFANY & BASIL JONES, TIFFANY, REAL PROPERTY § 854 (3d ed. 2001) (stating that the "touch and concern" requirement is met when a covenant "closely relates to the land or estate granted or its use, occupation or enjoyment"). A personal covenant, in contrast, does not touch and concern the land, because such a covenant affects the grantor personally and is unrelated to the use of the land. *Westland Oil*, 637 S.W.2d at 910.

Traditional Texas cases have employed a benefit/burden analysis when determining whether a covenant touches and concerns the land. In reliance on these cases, RHC argues that the TRMI Deed does not touch and concern the land because it conveys no benefit to the Refinery, even though it may impose a burden upon its owner. *See Davis v. Skipper*, 125 Tex. 364, 371, 83 S.W.2d 318, 321-22 (Tex. Comm'n App. 1935) ("In the absence of proof that a restriction was imposed for the benefit of other land, it is construed as a personal covenant merely with the grantor."); *McCart v. Cain*, 416 S.W.2d 463, 465 (Tex. Civ. App.–Fort Worth 1967, writ ref'd n.r.e.) (reiterating that party

seeking to enforce restrictive covenant must establish benefit to land). In response, the Appellants have identified more recent Texas cases in which courts have dispensed with the benefit requirement, and have enforced restrictive covenants upon a burden-only showing. *See Westland Oil*, 637 S.W.2d at 911 (concluding that covenant touches and concerns land because it burdens the promisor's estate and renders it less valuable); *Wimberly v. Lone Star Gas Co.*, 818 S.W.2d 868, 871 (Tex. App.–Fort Worth 1991, writ denied) (rejecting requirement that covenant must benefit land in order to fulfill touch and concern requirement).

Although the caselaw is somewhat unclear, it is at least arguable that the benefit requirement has been abandoned by the Texas courts.[18] Nevertheless, we still do not believe that the covenant in the TRMI Deed "touches and concerns" the land.[19] Any burden or benefit created by the TRMI Deed affects only TRMI personally and has no direct impact upon the land itself. The Refinery's owner may, in accordance with the deed's provisions, take remedial action or not take remedial action, pollute or not pollute, as long as contribution is not sought from TRMI. The covenant does not compel nor preclude the promisor or any subsequent owner from doing anything on the land itself. The covenant is not predicated upon an agreement to refrain from taking any action on the land, as in the case of a negative covenant. *See Mobil Oil Corp. v. Brennan*, 385 F.2d 951, 953 (5th Cir.

---

[18]In rejecting the Appellants' argument that the TRMI deed contains a real binding covenant, both the bankruptcy and the district courts appear to have concluded that a showing of both burden and benefit is required. Regardless of what test is employed, however, the covenant is unenforceable.

[19]We note that the newest draft version of the RESTATEMENT OF PROPERTY promulgated by the American Law Institute has abandoned the "touch and concern" requirement in favor of a list of policy considerations. *See* RESTATEMENT (THIRD) OF PROPERTY; SERVITUDES § 3.2 (Tentative Draft No. 2, 1991). Because Texas has not yet adopted this approach, we do not address in this opinion the numerous policy arguments advanced by both parties.

1967) (describing covenant preventing mineral estate owner from interfering with surface grazing and from placing pipelines above certain depth). Nor does it permit TRMI, the promisee, to enter or utilize the land for any purpose. *See, e.g. Wimberly*, 818 S.W.2d at 870-71 (holding that contract permitting gas company to purchase water from wells on owner's land was real binding covenant). Rather, it is a continuing and non-contingent contractual agreement under which the Debtor agrees to refrain from seeking environmental remediation or damages from TRMI. A personal contractual arrangement does not qualify as a covenant. *See Martindale v. Gulf Oil Corp.*, 345 S.W.2d 810, 813 (Tex. Civ. App.–Beaumont 1961, writ ref'd n.r.e.) (holding agreement between gas station owner and oil company, whereby owner agrees to purchase all petroleum requirements from company, was merely personal contract and not a covenant).

The deed's restrictive language does little more than shield TRMI from the possibility of a contribution suit by a future owner. In this respect, the covenant operates as a cost-shifting mechanism, by pushing all costs of remedial action forward onto the Debtor and any subsequent purchaser. We believe such a provision is more analogous to an obligation to assume an encumbrance, in this case the encumbrance being the responsibility to pay for all environmental clean-up costs. Under Texas law, a covenant to pay an encumbrance does not run with the land. *Talley v. Howsley*, 170 S.W.2d 240, 243 (Tex. Civ. App.–Eastland 1943), *aff'd*, 176 S.W.2d 158 (Tex. 1943); *cf. Cunningham v. Buel*, 287 S.W. 683, 686 (Tex. Civ. App.–San Antonio 1926, n.w.h.) (enforcing covenant in deed holding *buyer* harmless from outstanding liability, taxes, and water charges).

The Appellants rely heavily on the Texas Supreme Court's decision in *Westland Oil* to argue that a covenant affecting the *value* of the land is enough. We disagree. First, the court's decision

-20-

in *Westland Oil* is distinguishable because the party's obligations under the covenant were triggered by an action affecting the land itself. In that case, the covenant obligating the third-party to assign part of its interest in the oil and gas leases was predicated on the drilling of a test well on the land. *Westland Oil*, 637 S.W.2d at 907.[20] Moreover, even when a covenant impacts the value of land, it must still affect the owner's interest in the property or its use in order to be a real covenant. *See* 16 TEX. JUR. 3D *Covenants, Conditions, and Restrictions* § 10 (2002) (stating that a covenant that does not "relate to, or concern, the property or its use or enjoyment" is purely personal and does not bind subsequent owners); *Inwood*, 736 S.W.2d at 635 (discussing real covenant requiring homeowners to pay maintenance assessments for purpose of repairing and improving common and recreational areas); *Davis*, 83 S.W.2d at 321-22 (discussing covenant restricting use of land to "church purposes").

The Appellants alternatively argue that the covenant in the TRMI Deed is enforceable as an equitable servitude. They argue that this type of contractual restriction is binding when a party purchases land with notice of a restriction, regardless of whether it is a real covenant running with the land. The Appellants' argument lacks merit. An equitable servitude is enforceable when the contracting parties are in privity of estate at the time of the conveyance, and the subsequent party purchases the land with notice of the restriction. *Tarrant Appraisal Dist. v. Colonial Country Club*, 767 S.W.2d 230, 235 (Tex. App.–Forth Worth 1989, writ denied). However, the restriction sought to be enforced must still "concern the land or its use or enjoyment" in the case of an equitable

---

[20]Further, the obligation in *Westland Oil* was a positive one; once drilling commenced, the obligation to pay was automatic. Here, however, when and if remediation efforts occur, a negative obligation precludes the owner from seeking contribution. Such a negative obligation represents a more tenuous connection to the property.

servitude. *Montgomery v. Creager,* 22 S.W.2d 463, 466 (Tex. Civ. App.–Eastland 1929, no writ); *see also Tarrant*, 767 S.W.2d at 235 (discussing deed restriction limiting land to recreational, park, or scenic use). Therefore, because we have already concluded that the covenant in the TRMI Deed does not "concern the land or its use," it is likewise not enforceable as an equitable servitude. *Tarrant*, 767 S.W.2d at 235.

In sum, we hold that the covenant in the TRMI Deed is a personal covenant that is not binding upon RHC, either as a real covenant or as an equitable servitude.

## VII

In conclusion, we find the Appellants' attempts to shift all responsibility for the environmental contamination at the Refinery to RHC to be unpersuasive, based on our interpretation of the relevant documents. Thus, we AFFIRM the judgment of the district court, and hold that the Term Sheet does not create an implied indemnity barring RHC from seeking contribution from TRMI or Texaco, that RHC did not assume responsibility for all unknown environmental conditions under the Term Sheet, that TRMI is not a third-party beneficiary of the Term Sheet, and that the covenants in the TRMI Deed are personal and are not binding on RHC.