# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

January 27, 2014

Lyle W. Cayce
Clerk

No. 13-10461

In the Matter of: DENVER MERCHANDISE MART, INC.,

Debtor.

BANK OF NEW YORK MELLON, as successor to Bank of New York Global Capital Access One, Inc., Commercial Mortgage Bonds, Series 3, care of Berkadia Commercial Mortgage L.L.C.,

Appellant,

v.

GC MERCHANDISE MART, L.L.C., DENVER MERCHANDISE MART, INC., and HAWTHORN LAKES ASSOCIATES, LTD.,

Appellees.

Appeal from the United States District Court
for the Northern District of Texas

Before REAVLEY, DAVIS, and HIGGINSON, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Lender-appellant Bank of New York Mellon ("Lender") appeals the district court's judgment which, in relevant part, disallowed the Lender's claim for a contractual prepayment consideration.   We affirm.

## I.

This dispute arose in a complicated bankruptcy proceeding, but the fundamental dispute is a relatively straightforward question of contract

No. 13-10461

interpretation under Colorado law.   Debtor-appellee GC Merchandise Mart, LLC ("GCMM") owns the Denver Merchandise Mart, a large exposition center in Denver, Colorado.   GCMM's parent company is appellee Hawthorn Lakes Associates, Ltd., and appellee Denver Merchandise Mart, Inc. ("DMM") is an affiliate of GCMM.   All three companies filed petitions for voluntary Chapter 11 bankruptcy protection in March 2011.   The cases are being jointly administered, with DMM's case designated as the lead case.

GCMM executed a promissory note (the "Note") dated September 30, 1997 in favor of Dynex Commercial, Inc., a predecessor in interest to lender-appellant Bank of New York Mellon ("Lender") in exchange for a $30 million loan.   The Note bore interest at a non-default rate of 8.3% and contained several clauses, only two of which are at issue in this appeal: Article 4 ("Default and Acceleration") and Article 6 ("Prepayment").

Article 4 provides that "if any payment required in this Note is not paid prior to the tenth (10th) day after the date when due or on the Maturity Date or on the happening of any other default," certain sums become immediately due and payable, including the principal balance, interest, default interest, "other sums, as provided in this Note," and "all other moneys agreed or provided to be paid by Borrower in this Note, the Security Instrument or the Other Security Documents," among other things.   Article 6 provides that the Borrower may prepay the Note under certain circumstances but must also pay a Prepayment Consideration, which is essentially a penalty for prepayment.

GCMM stopped making payments on the Note in October 2010 and thus defaulted under its terms.   The Lender issued a notice of default, which GCMM failed to cure.   Though GCMM made two more partial payments, it made no payment whatsoever after December 2010.   As permitted by its security instruments, the Lender obtained an *ex parte* order appointing a

2

No. 13-10461

receiver of the Merchandise Mart, at which point GCMM and the other debtors filed for bankruptcy. At that time, GCMM owed the Lender approximately $24 million.

The Lender argued that payment of the Prepayment Consideration under Article 6, valued at $1.8 million, is required by Article 4's acceleration clause, notwithstanding the fact that GCMM stopped making payments under the Note after December 2010 and never paid the Note prior to the maturity date. The bankruptcy court disagreed on four grounds. First, it found that some payment, whether voluntary or involuntary, must actually be made to trigger the obligation to pay the Prepayment Consideration. Second, it found that the rationale for requiring a Prepayment Consideration did not apply here. Third, it found that the cases cited by the Lender were inapposite because in each of those cases,[1] the acceleration clause specifically provided that acceleration of the note would trigger the obligation to pay the prepayment consideration. Fourth and finally, the bankruptcy court noted that it would have been easy to expressly provide for payment of the Prepayment Consideration in the event of acceleration.

Thus, although the bankruptcy court allowed the Lender to recover a $25 million secured claim under the Note in conjunction with confirming the reorganization plan,[2] it disallowed the $1.8 million claim for the Prepayment Consideration under Article 6 of the Note.[3]

---

[1] *In re 400 Walnut Assocs., L.P.*, 461 B.R. 308 (Bankr. E.D. Pa. 2011); *In re Hidden Lake Ltd. P'ship*, 247 B.R. 722 (Bankr. S.D. Ohio 2000); and *In re CP Holdings, Inc.*, 332 B.R. 380 (W.D. Mo. 2005).

[2] The claim had increased from approximately $24 million at the time of bankruptcy to approximately $25 million at the time of plan confirmation because of interest.

[3] The bankruptcy court set the interest rate for the Lender's claim at 6%. However, it issued an "alternative ruling for purposes of appeal" that if it was found to have erred in excluding the Prepayment Consideration from the Lender's claim, then the interest rate should be set

No. 13-10461

The Lender appealed the bankruptcy court's order to the district court. The district court affirmed the bankruptcy court in full. The Lender timely appealed to this court. The only issue the Lender presents on appeal is whether or not GCMM became liable for the $1.8 Prepayment Consideration upon the pre-bankruptcy acceleration of the Note.

II.

In this dispute over the disallowance of a claim in a bankruptcy proceeding, the bankruptcy court had jurisdiction under 28 U.S.C. §§ 157(b)(2)(B) and 1334(b), and the district court had jurisdiction over the appeal from the bankruptcy court under 28 U.S.C. § 158(a)(1). We therefore have jurisdiction over this appeal from the district court's judgment pursuant to 28 U.S.C. §§ 158(d)(1) and 1291.

"We review the bankruptcy court's findings of fact for clear error and its conclusions of law *de novo*, using the same standards that the bankruptcy court and district court applied."[4] We look to applicable state law to determine the appropriate standard of review for interpretation of a contract.[5] Under Colorado law, the interpretation of a contract is a matter of law that is reviewed *de novo*.[6]

---

at 6.5% instead, to account for the "slightly riskier loan because . . . we have a higher loan-to-value ratio."

[4] *In re Homeowners Mortgage & Equity, Inc.*, 354 F.3d 372, 375 (5th Cir. 2003) (citing *Refinery Holding Co. v. TRMI Holdings, Inc. (In re El Paso Refinery, LP)*, 302 F.3d 343, 348 (5th Cir. 2002)).

[5] *See id.* (applying Texas law); and *Stinnett v. Colo. Interstate Gas Co.*, 227 F.3d 247, 254 (5th Cir. 2000) (same).

[6] *Allen v. Pacheco*, 71 P.3d 375, 378 (Colo. 2003) (en banc).

4

No. 13-10461

## III.

### A.   Colorado Contract Interpretation Principles

It is undisputed that Colorado law applies with respect to the interpretation of this contract.   The Supreme Court of Colorado, sitting *en banc*, summarized Colorado's general principles for contract interpretation as follows:

> We must construe the terms of the agreement in a manner that allows each party to receive the benefit of the bargain, and the scope of the agreement must faithfully reflect the reasonable expectations of the parties.   In other words, we must interpret the agreement in a manner that best effectuates the intent of the parties.   We ascertain the parties' intent by looking to the plain language of the agreement. We will enforce the agreement as written unless there is an ambiguity in the language; courts should neither rewrite the agreement nor limit its effect by a strained construction.   Thus, like any contract, an arbitration agreement must be given effect according to the plain and ordinary meaning of its terms.
>
> In determining whether an ambiguity exists, we must ask whether the disputed provision is reasonably susceptible on its face to more than one interpretation. We also evaluate the agreement as a whole and construe the language in harmony with the plain and generally accepted meaning of the words employed, unless the intent of the parties, as expressed in the contract, indicates that an alternative interpretation is intended.[7]

### B.   Relevant Colorado Cases

As the court in *Planned Pethood Plus, Inc. v. KeyCorp, Inc.*, 228 P.3d 262,

---

[7] *Id*. at 378 (citations omitted).

No. 13-10461

264 (Colo. App. 2010), noted, "Prepayment penalties . . . have seldom been the subject of litigation in Colorado." Indeed, only a few Colorado cases have dealt with prepayment penalties in any depth: *Carpenter v. Winn*, 566 P.2d 370 (Colo. App. 1977)*, Kirk v. Kitchens*, 49 P.3d 1189 (Colo. App. 2002), and *Planned Pethood*. Fortunately, these cases sufficiently develop the applicable principles to resolve this dispute.

A lender has the right to refuse early payment,[8] but the lender may expressly waive the right by contract. If a lender does not waive the right to refuse early payment, a borrower may not prepay the note without paying all future interest as well.[9] If a lender does expressly waive the right to refuse early payment, then it is not entitled to any prepayment penalty unless the contract expressly provides for such prepayment penalty.[10]

Unless specifically provided for by contract, a lender may not assess a prepayment penalty when the note is accelerated at the lender's option.[11] Generally, a lender's choice to accelerate acts as a waiver of the right to a prepayment penalty.[12] The caveat is that a court may choose to impose the prepayment penalty even when a lender accelerates the note at its option if there is evidence that the borrower defaulted to avoid additional interest.[13]

*Planned Pethood* held that a prepayment penalty (also known as a prepayment premium or fee) is not a remedy for breach of contract but

---

[8] *Carpenter*, 566 P.2d at 370.

[9] *Id.* at 371.

[10] *Kirk*, 49 P.3d at 1193 (citing *Burks v. Verschuur*, 532 P.2d 757 (Colo. App. 1974)).

[11] *Id.* at 1193 (citing numerous cases from other jurisdictions) and 1194 (adopting the rule for Colorado).

[12] *Id.* at 1194.

[13] *Id.* at 1195.

6

No. 13-10461

consideration for the borrower's right or privilege to prepay.[14]   Accordingly, a prepayment penalty is not liquidated damages and is not subject to the rules of reasonableness for liquidated damages.[15]   Furthermore, the *Planned Pethood* court reasoned that because a prepayment penalty is not properly characterized as liquidated damages due to breach of contract, it should not trigger application of section 506(b) of the Bankruptcy Code,[16] as *In re A.J. Lane & Co., Inc.*, 113 B.R. 821 (Bankr. D. Mass. 1990), had ruled under non-Colorado law.[17]

Parties are free to contract however they wish around these general rules, provided they do so clearly.

### C.   Applicable Provisions of the Note

As noted above, this appeal hinges on the interpretation of Articles 4 and 6 of the Note.   Article 4 ("Default and Acceleration") provides in full:

> (a) The whole of the principal sum of this Note, (b) interest, default interest, late charges and other sums, as provided in this Note, the Security Instrument or the Other Security Documents (defined below), *(c) all other moneys agreed or provided to be paid by Borrower in this Note, the Security Instrument or the Other Security Documents*, (d) all sums advanced pursuant to the Security Instrument to protect and preserve the

---

[14] *Planned Pethood*, 228 P.3d at 264-65.

[15] *Id.*

[16] Section 506(b), 11 U.S.C. § 506(b), provides:

> (b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

[17] 228 P.3d at 265-66.

No. 13-10461

> Property and the lien and the security interest created thereby, and (e) all sums advanced and costs and expenses incurred by Lender in connection with the Debt (defined below) or any part thereof, any renewal, extension, or change of or substitution for the Debt or any part thereof or the acquisition or perfection of the security therefor, whether made or incurred at the request of Borrower or Lender (all the sums referred to in (a) through (e) above shall collectively be referred to as the "Debt") shall without notice become immediately due and payable at the option of Lender if any payment required in this Note is not paid prior to the tenth (10th) day after the date when due or on the Maturity Date or on the happening of any other default, after the expiration of any applicable notice and grace periods, herein or under the terms of the Security Instrument or any of the Other Security Documents (collectively, an "Event of Default"). [emphasis added]

Article 6 ("Prepayment") provides that the Borrower may not prepay the Note prior to October 1, 2007 (the "Lockout Period"), or within six (6) months from the maturity date (October 1, 2012), i.e., April 1, 2012.   During the period between October 1, 2007 and April 1, 2012, however, Article 6(A)(1) gives the Borrower, GCMM, the "right or privilege to prepay all (but not less than all) of the unpaid principal balance of this Note" as well as all interest to the Prepayment Date, the interest due "to and including the first day of the calendar month immediately following the Prepayment Date," payment of any other sums due under the Note and related security instruments, the Release Fee, and, most relevantly, the Prepayment Consideration.   Article 6(A)(1) also provides the formula for calculating the Prepayment Consideration.

Article 6(A)(1) also discusses prepayment in the event of a default:

> If a Default Prepayment (defined herein) occurs, Borrower shall pay to Lender the entire Debt,

8

including, without limitation, the Prepayment Consideration (defined below).

For purposes of this Note, the term "Default Prepayment" shall mean a *prepayment* of the principal amount of this Note *made* during the continuance of any Event of Default or after an acceleration of the Maturity Date under any circumstances, including, without limitation, a prepayment occurring in connection with reinstatement of the Security Instrument provided by statute under foreclosure proceedings or exercise of a power of sale, any statutory right of redemption exercised by Borrower or any other party having a statutory right to redeem or prevent foreclosure, any sale in foreclosure or under exercise of a power of sale or otherwise. [emphasis added]

The only other potentially relevant provision is Article 6(A)(3), which provides:

Borrower shall pay the Prepayment Consideration due hereunder whether the prepayment is voluntary or involuntary (including without limitation in connection with Lender's acceleration of the unpaid principal balance of the Note) or the Security Instrument is satisfied or released by foreclosure (whether by power of sale or judicial proceeding), deed in lieu of foreclosure or by any other means.

IV.

Under Colorado law, it is relatively simple to decide the only issue presented here, whether the acceleration of the Note due to GCMM's default by nonpayment under Article 4 triggered the obligation to pay the Prepayment Consideration under Article 6. Article 4 of the Note, concerning acceleration and default, provides for acceleration of principal, interest owed, and other things. As the Lender concedes, the only language that could possibly apply

9

to a prepayment penalty is the acceleration of "all sums, as provided in this Note" or "all other moneys agreed or provided to be paid by Borrower in this Note, the Security Instrument or the Other Security Documents."   Under this plain language, we must look elsewhere in the note to determine what "other sums" or "other moneys" must be paid.   Logically, it cannot include every *potential* payment referred to in the Note or else contract conditions would mean nothing.

To determine whether the Prepayment Consideration was "agreed or provided to be paid by Borrower in this Note," we must look to Article 6, concerning prepayment.   There are several conditions that might trigger the obligation to pay the Prepayment Consideration, but none requires the Borrower to pay the Prepayment Consideration absent an actual prepayment, which did not occur here.

First, Article 6(A)(1) gives the Borrower the "right or privilege" to prepay "all (but not less than all) of the unpaid balance of this Note" subject to paying the Prepayment Consideration but does not require it to do so.   Because GCMM did not prepay, this provision cannot apply.

Second, also under Article 6(A)(1), the Borrower is obligated to pay in the event of a Default Prepayment, which is defined as a prepayment occurring during a default or acceleration "under any circumstances."   Again, the plain language requires an actual prepayment to trigger the obligation to pay the Prepayment Consideration, and no prepayment occurred here.

Third and finally, Article 6(A)(3) provides that "Borrower shall pay the Prepayment Consideration due hereunder whether the prepayment is voluntary or involuntary (including without limitation in connection with Lender's acceleration of the unpaid principal balance of the Note) or the Security Instrument is satisfied or released by foreclosure (whether by power

of sale or judicial proceeding), deed in lieu of foreclosure or by any other means." Again, the plain language contemplates an actual prepayment, which did not occur here.

Moreover, there is no language in the Note which would *deem* the prepayment to have been made in the event of acceleration for any reason. It is not difficult to achieve that goal. *See, e.g.*, *In re CP Holdings, Inc.*, 332 B.R. at 382, in which the note provided, in part: "The undersigned [borrower] agrees that if the holder of this Note [lender] accelerates the whole or any part of the principal sum . . . the undersigned waives any right to prepay said principal sum in whole or in part without premium *and agrees to pay a prepayment premium*." (emphasis added)). The Note here evidences no such clear intent.

Under general Colorado law, a lender is not entitled to a prepayment penalty when the lender chooses to accelerate the note. Absent a clear contractual provision to the contrary or evidence of the borrower's bad faith in defaulting to avoid a penalty, the lender's decision to accelerate acts as a waiver of a prepayment penalty. Here, that general rule controls.

The plain language of the contract does not require the payment of the Prepayment Consideration in the event of mere acceleration. Quite the opposite, in fact: the plain language plainly provides that no Prepayment Consideration is owed unless there is an actual prepayment, whether voluntary or involuntary. The Lender has advanced no viable alternative interpretation of the Note.

V.

Accordingly, we affirm.